UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:05-cr-005 |
| | ) | *Edgar* |
| JOSE LUIS SERRANO-LOPEZ | ) | |

**MEMORANDUM**

Defendant Jose Luis Serrano-Lopez ("Serrano") moves to suppress from use at trial all evidence seized as a result of the search of the vehicle he was driving on January 12, 2005, and any subsequent statements made to law enforcement officials. [Doc. No. 22]. The Court held an evidentiary hearing on June 10, 2005. After hearing the proof and oral argument from the parties and considering Serrano's supplemental brief [Doc. No. 31], the Court concludes that the motion to suppress will be **DENIED**.

**I.     Facts**

On the evening of January 12, 2005, Agent Matt Bales and Lieutenant Bobby Queen of the Tenth Judicial Drug Task Force were parked in the median of Interstate 75 near mile-marker thirty nine. Shortly before 5:30 p.m., Agent Bales and Lieutenant Queen observed a BMW X5 sport utility vehicle heading south. Based on the driver's rigid demeanor and failure to turn and look at the officers, the officers decided to follow the vehicle. The X5 was traveling approximately seventy miles per hour in the right lane, or slow lane of traffic. For approximately

-1-

two miles Agent Bales and Lieutenant Queen trailed the X5, remaining two car-lengths behind in the left lane, or fast lane of traffic. While following the X5, Agent Bales and Lieutenant Queen observed that it had a Texas license plate, and they verified its validity. Also while trailing the X5, Agent Bales and Lieutenant Queen observed the X5 cross into the emergency lane once and cross the center-line, partially entering the fast lane, on two occasions. Based on these actions, Lieutenant Queen engaged his police lights and stopped the X5.

Upon stopping the X5 Agent Bales approached the passenger-side window of the vehicle. Agent Bales requested a license and registration from the driver, Serrano, and asked Serrano to step to the back of the vehicle. Serrano, a Hispanic who spoke English with a slight accent, understood Bales and complied with all of these requests, providing a Texas license and registration. After giving the license and registration to Lieutenant Queen to run background checks on each, Agent Bales informed Serrano of the reason for the traffic stop and inquired about Serrano's itinerary. Serrano indicated that he was in Knoxville, Tennessee for three or four days visiting his nephews and was now returning to his home in El Paso, Texas. When asked where he stayed in Knoxville, Serrano said downtown. Agent Bales asked where Serrano stayed downtown, and Serrano said just downtown. Agent Bales next asked if Serrano was carrying any firearms, drugs, or large amounts of United States currency to which Serrano replied, "No, only what's on me," displaying the contents of his wallet. Agent Bales then asked Serrano for consent to search the vehicle. Serrano complied, saying "Yes, go ahead," and gesturing toward the vehicle.

While Lieutenant Queen was still awaiting the results of the check on the license and

registration, Agent Bales began to search the vehicle. Agent Bales opened the rear hatch and searched the only luggage in the vehicle, a suit bag. Inside the luggage Agent Bales found one change of clothing and two bundles of currency, estimating each bundle to contain thousands of dollars. Armed with this discovery, Agent Bales returned to Serrano, asking why Serrano had only one change of clothes for a three to four day visit. Serrano said that he bought clothes in Knoxville and left them there when he departed. Agent Bales also asked why Serrano did not inform him of the two bundles of cash in the luggage, and Serrano indicated that the money was for his wife.

Shortly thereafter Lieutenant Queen received a response on the license and registration, learning that each were valid. Lieutenant Queen then proceeded to assist Agent Bales in the search of the vehicle. While searching the driver's area of the vehicle, Lieutenant Queen found three cell phones. Lieutenant Queen then searched the undercarriage of the vehicle and found what he thought to be a hidden compartment extending the length of the vehicle. Agent Bales also thought it was a hidden compartment and then handcuffed Serrano. Lieutenant Queen asked Serrano if the vehicle had a hidden compartment, and Serrano replied, "Your searching, go ahead and look." To ensure that the officers were not injured by traffic on the interstate while searching the undercarriage of the vehicle, Agent Bales and Lieutenant Queen took Serrano and the vehicle to the Task Force headquarters in Charleston, Tennessee, approximately five miles from the traffic stop.

Agent Bales and Lieutenant Queen arrived at headquarters with Serrano and the BMW X5 at approximately 6:00 p.m. Lieutenant Queen, along with several other officers, opened the

-3-

Case 1:05-cr-00005   Document 32   Filed 07/22/05   Page 3 of 19   PageID #: 4

hidden compartment and found approximately $1,500,000 in United States currency. Meanwhile another officer, Agent Frost, interviewed Serrano.

At approximately 7:30 to 7:45 p.m. Mark Acton, a Senior Special Agent with the Department of Homeland Security and fluent in Spanish, arrived at the Task Force's headquarters to speak with Serrano. When Agent Acton arrived, Serrano was sitting in the lobby area of the Task Force headquarters and was not handcuffed. Agent Acton spoke with Serrano in a private office, conversing with Serrano only in Spanish. Initially, Agent Acton advised Serrano of his *Miranda* rights. Serrano indicated that he understood those rights and signed a waiver written in Spanish, Form I-214. At this point Agent Acton correctly believed Serrano was a Mexican citizen but a lawful resident of the United States. Agent Acton then took a statement from Serrano. Later that night, at 1:00 or 2:00 a.m. on January 13, Agent Acton transported Serrano to the Hamilton County Jail. At that time Agent Acton informed Serrano of his consular rights and asked Serrano if he wanted to contact the Mexican consulate in Atlanta. Serrano refused the offer.

## II. Analysis

Serrano seeks to suppress from use at trial the evidence seized from the X5 and his subsequent statements to law enforcement officials. Serrano raises five grounds for suppressing the evidence: that the traffic stop of the vehicle was unconstitutional; that the law enforcement officers did not have reasonable suspicion to warrant a prolonged detention; that the detention became an arrest for which there was no probable cause; that he did not consent to the search of the vehicle, and even if he did, his consent was not voluntary; and that law enforcement officers

did not inform Serrano of his consular rights in violation of Article 36 of the Vienna Convention on Consular Relations ("Vienna Convention"). Additionally, Serrano seeks to suppress the information gleaned during the search of the three cell phones found in the passenger compartment of the X5, contending such a search was unconstitutional. The Court finds that none of these arguments warrant suppressing the evidence.

**A. <u>Traffic Stop of Vehicle</u>**

Serrano first seeks to suppress the evidence because, as he contends, the traffic stop was unconstitutional. Officers may temporarily stop a vehicle and detain its passengers where it is not "'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *accord United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810 (citations omitted); *accord Copeland*, 321 F.3d at 592; *Ferguson*, 8 F.3d at 391. Probable cause will be insufficient, however, when the circumstances involve "searches or seizures conducted in an extraordinary manner," such as "seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Whren*, 517 U.S. at 818; *accord Copeland*, 321 F.3d at 592 n.3. Such situations do not exist here, so the officer's traffic stop of Serrano's vehicle was reasonable if based upon probable cause to believe that Serrano committed a traffic violation.

Probable cause is defined as "'reasonable grounds for belief, supported by less than prima

facie proof but more than mere suspicion.'" *Copeland*, 321 F.3d at 592 (quoting *Ferguson*, 8 F.3d at 392). Whether an officer had probable cause to stop a vehicle depends on "the totality of the circumstances from the perspective of the officer at the time of the incident," not what he discovers after the stop. *Id.* (citing *Ferguson*, 8 F.3d at 391).

Here, Agent Bales and Lieutenant Queen had probable cause to believe that Serrano committed a traffic violation. While driving behind Serrano's vehicle, Agent Bales and Lieutenant Queen watched Serrano violate Tenn. Code Ann. § 55-8-123, which requires a vehicle be driven as nearly as practicable within a single lane of traffic. Agent Bales and Lieutenant Queen witnessed Serrano cross into the emergency lane by approximately two feet. When he pulled back into his traffic lane he crossed the center-line, partially entering the fast lane of traffic. After abruptly jerking his car back into his traffic lane, the slow lane, Serrano again crossed the center-line. After watching Serrano fail to keep his vehicle within his traffic lane on three occasions in a short distance, Agent Bales and Lieutenant Queen had probable cause to believe that Serrano committed a traffic violation, justifying the stop of Serrano's vehicle.

The Sixth Circuit has repeatedly confirmed, in published and unpublished decisions, the constitutionality of a traffic stop for witnessing a vehicle violate the integrity of a traffic lane, in violation of Tenn. Code Ann. § 55-8-123. *See United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996) (traffic stop constitutional where vehicle crossed two lanes of traffic at once, was straddling the right lane, and was weaving back and forth between the right lane and the emergency lane); *United States v. Pino*, 855 F.2d 357, 361 (1988) (traffic stop constitutional

where vehicle swerved into the emergency lane and, in returning to its lane, crossed partially into the left lane); *see also United States v. Shanu*, No. 98-6083, 2000 WL 658058, at *2 (6th Cir. May 9, 2000) (traffic stop constitutional where vehicle crossed into the emergency lane by approximately two feet); *United States v. Little*, No. 97-6200, 1999 WL 196515, at *4 (6th Cir. Mar. 24, 1999) (traffic stop constitutional where vehicle twice swerved into the emergency lane).

Indeed, on only one occasion has the Sixth Circuit held that witnessing a vehicle swerve across a traffic lane does not warrant probable cause to believe that a traffic violation occurred under Tenn. Code. Ann. § 55-8-123. *See United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000). In *Freeman* the defendant crossed into the emergency lane for a distance of twenty to thirty feet while driving a large motor home. *Id.* at 465. A police officer witnessed this action, stopped the vehicle, eventually searched the motor home, and discovered contraband. *Id.* at 465-66. Concluding that the motor home's venture into the emergency lane was not a violation of Tenn. Code Ann. § 55-8-123, the Sixth Circuit held that the traffic stop and subsequent search were unconstitutional. *Id.* at 466-67. A separate concurrence by Judge Clay explains the court's reasoning:

> We agree that such a brief period of time where the Winnebago crossed over the line did not provide Officer Tate probable cause to stop the vehicle for a traffic violation, particularly where the weather conditions on the day in question were windy, Adams was rounding a curve in the road at the time, and Officer Tate admitted that it would not be unusual for a Winnebago to cross over the white line inasmuch as the vehicle is top-heavy and the Memphis area gets a lot of high winds, especially in that area of open highway.

*Id.* at 467-68 (Clay, J., concurring).

In interpreting a similar Ohio provision requiring vehicles to remain in a single lane of traffic, the Sixth Circuit subsequently limited *Freeman* to its facts. *See United States v. Randall*, No. 01-3855, 2003 WL 1949613, at *1 (6th Cir. Apr. 22, 2003). In so doing, the *Randall* court noted that the vehicle in question deviated from its lane of traffic at least three times in two miles, as compared to one such occurrence in *Freeman*. *Id.* at *4. Further, the *Randall* court did not find any circumstances warranting departure from a lane of traffic such as high winds or an exceptionally large, top-heavy vehicle as existed in *Freeman*. *Id.* Accordingly, given the distinguishing facts before it, the *Randall* court held constitutional the traffic stop for deviating from a single lane of traffic. *Id.*

Like *Randall* the instant case is distinguishable from *Freeman*. Here, Serrano violated the integrity of his lane three times, entering the emergency lane once and crossing the center-line twice. Serrano was driving a BMW sport-utility vehicle, vastly different from the large, top-heavy motor home at issue in *Freeman*. Further there is no evidence of high winds or any other weather condition warranting Serrano's deviation from a lane of traffic, much less three such deviations. Accordingly, the Court finds the instant case distinguishable from *Freeman*. Agent Bales and Lieutenant Queen had probable cause to believe that Serrano committed a traffic violation, justifying the stop of Serrano's vehicle.[1]

### B. <u>Detention after the Traffic Stop</u>

---

[1] The Court here has, of necessity, made a decision to accept as credible the testimony of the law enforcement officers regarding the traffic stop, as well as on other matters. Serrano did not testify. It is of some concern to the Court, however, that the officers possibly produced the traffic violation by following Serrano, a circumstance which, if it occurred, this Court certainly does not condone; and which, if it occurred, could result in a finding that the traffic stop was not justified.

-8-

Serrano also argues that his detention was unconstitutional in two manners: first that Agent Bales and Lieutenant Queen did not have reasonable suspicion to justify a detention which exceeded the scope of the traffic stop; and second that the prolonged detention became an arrest for which Agent Bales and Lieutenant Queen did not have the requisite probable cause. Both arguments are unpersuasive.

"[A]s soon as the purpose of a traffic stop has been accomplished, an officer cannot further detain the vehicle or its occupants unless facts occur which would generate reasonable suspicion to justify further detention." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (citing *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995)). "[T]he subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). "To determine whether a detention is reasonable, the court should consider 'whether the officer's action was justified at its inception, and whether it is reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Berkemer*, 468 U.S. at 439 (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968))). Importantly, "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" *Id.* (quoting *United States v. Bradshaw*, 102 F.3d 204, 212 (6th Cir. 1996)).

Here, the Court finds that Agent Bales' and Lieutenant Queen's detention of Serrano was based on reasonable suspicion and, therefore, constitutional. There is no doubt that Agent Bales and Lieutenant Queen could lawfully detain Serrano while checking his license and registration.

*See Wellman*, 185 F.3d at 656. And before Lieutenant Queen had received the results of this inquiry, Agent Bales had received consent to search the vehicle and had made discoveries contradicting Serrano's statements and creating reasonable suspicion to warrant further detention. Specifically, while Lieutenant Queen was still awaiting the response on the license and registration, Agent Bales discovered in Serrano's luggage two bundles of cash, contrary to Serrano's statements otherwise, and one change of clothing, despite Serrano's story that he was visiting his nephews for three to four days. In short, while the officers had Serrano lawfully detained pursuant to the traffic stop, Agent Bales lawfully discovered evidence creating reasonable suspicion to justify detaining Serrano beyond the point when the purpose for the traffic stop was accomplished. Accordingly, the Court finds that Agent Bales' and Lieutenant Queen's detention of Serrano was constitutional.

Further, the Court finds that the detention of Serrano did not become an arrest requiring probable cause. "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Here, Agent Bales and Lieutenant Queen pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. Upon stopping Serrano for the traffic violation, Agent Bales quickly received consent to search the vehicle. During his search, Agent Bales discovered two bundles of cash and only one change of clothing, contradicting Serrano's earlier statements and arousing Agent Bales' suspicions. Moments later Lieutenant Queen

-10-

discovered what he believed to be a hidden compartment on the undercarriage of the vehicle, further arousing the officers' suspicions. When asked whether the X5 had a hidden compartment, Serrano replied, "Your searching, go ahead and look." In an effort to safely, but quickly, search the undercarriage of the vehicle, Agent Bales and Lieutenant Queen took Serrano and the X5 to the Task Force headquarters, approximately five miles away. At headquarters, Lieutenant Queen confirmed his suspicions, finding approximately $1,500,000 in a hidden compartment on the undercarriage of the vehicle. Throughout the traffic stop and investigation, Agent Bales and Lieutenant Queen pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. Accordingly, Serrano's detention did not ripen into an arrest requiring probable cause.

### C. Consent to the Vehicle Search

Serrano also argues that the Court should suppress the evidence seized in this case because he did not voluntarily consent to the search of the vehicle. A search is valid if conducted pursuant to a person's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004); *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998). When the Government relies "'upon consent to justify the lawfulness of a search, [the government] has the burden of proving that the consent was, in fact, freely and voluntarily given.'" *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). The consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992)).

-11-

The Court finds that Serrano consented to the search of the car. As each testified to at the suppression hearing, both Agent Bales and Lieutenant Queen heard Serrano consent to the search of the X5. Specifically, when Agent Bales requested Serrano's consent to search the vehicle, Serrano replied, "Yes, go ahead," and gestured toward the vehicle. Though Hispanic, there is no indication that Serrano was unable to fully understand Agent Bales' request for consent. In fact, to that point Serrano had conversed with Agent Bales in English, fully understood Agent Bales' questions and appropriately responded to each. Based on the evidence adduced at the suppression hearing, the Court finds that Serrano consented to the search of the X5.

Further, the Court finds that Serrano's consent was voluntary. "[W]hether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied is a question of fact to be determined from the totality of the circumstances." *Schneckloth*, 412 U.S. at 227; *accord Carter*, 378 F.3d at 587 (citing *Schneckloth*). In making this determination, the following factors are to be considered:

> First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; and whether the individual understands his or her constitutional rights. . . . Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police . . . and indications of more subtle forms of coercion that might flaw an individual's judgment.

*United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (citations and quotations omitted); *accord United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002); *Worley*, 193 F.3d at 386.

In considering these factors in the instant case, the Court finds that Serrano freely and voluntarily consented to the search of the car. There is no evidence that Serrano is unusually vulnerable to coercion due to youth or old age. According to Agent Bales, Serrano was not under the influence of alcohol or drugs. Further, as noted above, there is no indication that Serrano failed to understand Agent Bales' request to search the vehicle. There was no lengthy detention or interrogation. The officers did not use coercive or punishing tactics in seeking consent. The encounter occurred in a public place, on the side of a public street. Based on these facts, the Court finds that Serrano freely and voluntarily consented to the search of the car.

### D. **Search of Cell Phones**

Next, Serrano contends that the search of information contained on the three cell phones was unconstitutional. Fatal to Serrano's argument, there is no evidence that the officers ever searched the information on the cell phones. In other words, at the evidentiary hearing neither side adduced any evidence that the officer searched the stored phone numbers, call log, or any other information on any of the three cell phones.

Nonetheless, even assuming the officers searched the information on the cell phones, Serrano is still not entitled to suppress that evidence. It appears to the Court that neither the Sixth Circuit nor any other court has directly addressed this issue. However, various courts have upheld the constitutionality of a warrantless search of a pager. Indeed, following a lawful arrest the exigent circumstances surrounding the potentially fleeting nature of the evidence contained in a pager justifies a warrantless search of its contents. *United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996); *United States v. Chan*, 830 F.Supp. 531, 533 (N.D. Cal. 1993); *see also United*

*States v. Hunter*, No. 96-4259, 1998 WL 887289, at *3-*4 (4th Cir. Oct. 29, 1998); *United States v. Stroud*, No. 93-30445, 1994 WL 711908, at *2 (9th Cir. Dec. 21, 1994). This rationale applies similarly to cell phones. Accordingly, even if the officers searched the information contained in the cell phones, the search was constitutional.

### E. Consular Rights under the Vienna Convention

Lastly, Serrano contends that the evidence seized from the X5 and the statement he subsequently gave to Agent Acton should be suppressed because he was not timely advised of his consular rights in violation of Article 36 of the Vienna Convention. "The Vienna Convention is a 79-article multilateral treaty negotiated in 1963 and ratified by the United States in 1969 of which Mexico is a signatory nation." *Cardenas v. Dretke*, 405 F.3d 244, 251 (5th Cir. 2005). Article 36 of the Vienna Convention provides, in relevant part, as follows:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
> . . . .
>> (b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph*[.]

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (ratified November 24, 1969) (emphasis added).

Serrano specifically contends that the law enforcement officers violated the final sentence

-14-

of Article 36, paragraph 1(b), by failing to inform Serrano of his consular rights without delay. Recognizing that Agent Acton informed him of his consular rights in the early morning hours of January 13, 2005, Serrano argues that law enforcement officials should have done so approximately five hours earlier, when they knew Serrano was a Mexican national.

The Sixth Circuit has directly addressed and rejected Serrano's claim. In *United States v. Page*, 232 F.3d 536 (6th Cir. 2000) the Sixth Circuit explicitly holds that "there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36" of the Vienna Convention. *Id.* at 540. The decisions of every other circuit to consider the issue are in accord. *See United States v. Minjares-Alvarez*, 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Jimenez-Nava*, 243 F.3d 192, 198-200 (5th Cir. 2001); *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000); *United States v. Cordoba-Mosquera*, 212 F.3d 1194, 1196 (11th Cir.2000); *United States v. Lombera-Camorlinga*, 206 F.3d 882, 885 (9th Cir.2000) (en banc); *United States v. Li*, 206 F.3d 56, 60, 62 (1st Cir.2000) (en banc); *see also United States v. Ortiz*, 315 F.3d 873, 886-87 (8th Cir. 2002) (holding that, on the facts of the case, violation of Article 36, paragraph 1(b), does not require suppressing evidence). Accordingly, pursuant to the binding precedent of this circuit and the persuasive opinions of sister circuits, Serrano is not entitled to the suppression of the evidence, including his statements, despite any alleged violation of Article 36 of the Vienna Convention.

Recognizing that the Courts of Appeals' decisions are not favorable to his argument, Serrano relies heavily on the decision of the International Court of Justice ("ICJ") in *Avena and other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. 128 (Mar. 31) ("*Avena*"). In *Avena* the ICJ

interpreted Article 36, paragraph 1(b)'s requirement that authorities inform a foreign national of his consular rights "without delay." 2004 I.C.J. 128 at ¶¶ 52, 53, 75, 83. Mexico argued that United States law enforcement officials violated Article 36 of the Vienna Convention in 52 separate cases involving Mexican nationals. *Id.* at ¶ 17. In one particular case, that of Arturo Juarez Suarez ("Juarez"), law enforcement officials knew at the time of the arrest that Juarez was a Mexican national but only informed him of his consular rights forty hours after his arrest. *Id.* at ¶¶ 59, 89. In determining whether the law enforcement officials informed Juarez of his consular rights "without delay", the ICJ held that

> [a]lthough . . . the duty to inform an individual [of his consular rights] under Article 36, paragraph 1(b), is not to be understood as necessarily meaning 'immediately upon arrest,' there is nonetheless a duty upon the arresting authorities to give that information to an arrested person as soon as it is realized that the person is a foreign national, or once there are grounds to think that the person is probably a foreign national.

*Id.* at ¶ 88; *accord id.* at ¶ 63. Because law enforcement officials knew Juarez was a foreign national forty hours before informing him of his consular rights, the ICJ "conclude[d] that the United States violated the obligation incumbent upon it under Article 36, paragraph 1(b), to inform Mr. Juarez without delay of his consular rights." *Id.* at ¶ 89; *accord id.* at ¶ 106(1).

Initially, it is unclear "whether a federal court should give effect, as a matter of judicial comity and uniform treaty interpretation, to the ICJ's judgment" in *Avena*. *Medillin v. Dretke*, ---U.S.---, 125 S.Ct. 2088, 2089 (2005) (per curiam opinion dismissing writ of certiorari as improvidently granted). Indeed, the Supreme Court avoided deciding the issue by dismissing the writ of certiorari as improvidently granted in *Medillin*. *Id.* at 2092. And only one circuit

-16-

court has addressed *Avena*, refusing to follow the ICJ's decision. *See Cardenas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005); *Medillin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004).

Nonetheless, it is unnecessary for this Court to now decide whether the ICJ's holding in *Avena* is precedent for this Court to follow. For even if it is, Serrano is not entitled to the relief he seeks. In other words, even pursuant to the holding of *Avena*, the law enforcement officials' actions in this case do not necessitate suppressing the evidence or Serrano's statements.

Under the dictates of *Avena*, law enforcement officials in the instant case arguably violated the requirements imposed by Article 36, paragraph 1(b), of the Vienna Convention. According to Agent Acton's testimony, he believed Serrano was a Mexican national at about 8:30 p.m. on January 12, 2005, but did not inform Serrano of his consular rights until several hours later, about 1:00 or 2:00 a.m. on January 13, 2005. Granted, Agent Acton did not inform Serrano of his consular rights immediately upon realizing that Serrano was a foreign national. However, the five hour delay in this case is drastically different from the forty hour delay in *Avena*.

Regardless, this Court need not now decide whether this five hour delay constitutes a violation of Article 36, paragraph 1(b), as interpreted by the ICJ in *Avena*. For even if the law enforcement officials in this case violated Article 36, paragraph 1(b), by failing to inform Serrano of his consular rights immediately upon determining he is a foreign national, Serrano is nonetheless not entitled to the relief he seeks. Even pursuant to the holding of *Avena*, the failure to immediately advise Serrano of his consular rights does not necessitate suppressing the evidence or Serrano's statements.

In *Avena* Mexico specifically requested "that the convictions and sentences of the 52 Mexican nationals be annulled, and that, in any future criminal proceedings against these 52 Mexican nationals, evidence obtained in breach of Article 36 of the Vienna Convention be excluded." 2004 I.C.J. 128 at ¶ 117; *accord id.* at ¶ 126. The ICJ rejected this blanket request. *Id.* at ¶ 127. Instead, the ICJ held that the proper remedy is for "the United States to permit review and reconsideration of these nationals' cases by the United States courts . . . with a view to ascertaining whether in each case the violation of Article 36 committed by the competent authorities caused actual prejudice to the defendant in the process of administration of criminal justice." *Id.* at ¶ 121; *accord id.* at ¶¶ 138-144. Thus, a breach of Article 36, paragraph 1(b) may warrant the exclusion of evidence obtained due to the breach, so long as the breach caused actual prejudice to the defendant.

The Court finds that in the instant case even if the failure to immediately inform Serrano of his consular rights constitutes a breach of Article 36, paragraph 1(b), the violation did not cause actual prejudice to Serrano and does not warrant suppressing the evidence or Serrano's statements. Instructively, before providing a statement to Agent Acton, Serrano was advised of his *Miranda* rights in Spanish, waived those rights, and signed a waiver written in Spanish. The *Miranda* warnings inform a defendant of his right to counsel and the right to remain silent, both arguably more powerful rights than the consular rights contained in Article 36, paragraph 1(b). Yet, Serrano chose to waive those rights, indicating a willingness to cooperate with law enforcement officials and signifying a lack of prejudice caused by the failure to inform Serrano of his consular rights. And lending more credence to the Court's conclusion, when advised of

-18-

his consular rights just a few hours after making a statement to Agent Acton, Serrano chose not to speak to the Mexican consulate in Atlanta. Because the failure to immediately inform Serrano of his consular rights without delay did not prejudice Serrano, Serrano's statements and the evidence obtained due to the failure need not be excluded, even under *Avena*.

Serrano's motion to suppress the evidence seized during the search of the BMW X5, the search of the three cell phones, and any subsequent statements [Doc. No. 22] will be **DENIED**. A separate order will enter.

>                  */s/ R. Allan Edgar*
>                  R. ALLAN EDGAR
>          CHIEF UNITED STATES DISTRICT JUDGE